Exhibit 1

1             UNITED STATES BANKRUPTCY COURT
          EASTERN DISTRICT OF TEXAS (SHERMAN)

2

3  IN RE:                  )
                           )    CASE NO. 24-42950

4  JOSEPH ANTHONY DOWDALL,  )    CHAPTER 7
                           )

5        Debtor.       )

6

7

8

9

10

11          TRANSCRIPTION OF AUDIO RECORDED

12      341 CREDITORS MEETING HELD TELEPHONICALLY

13         341 AUDIO 04.04.25 #1 AND #2

14         Durations: 45:55 and 18:42

15

16

17

18

19

20             DISCLAIMER

21

The transcription and translation of the contents
22  of this digital file recorded material are based
upon the recording as heard on the particular
23  electronic equipment used, the quality of the
recording provided, the speaking speed, and the
24  content of the conversation as understood by the
reporter.  Furthermore, proper names were spelled
25  phonetically.



Case 24-42950   Doc 42-1   Filed 05/20/25   Entered 05/20/25 08:28:27   Desc Exhibit
Transcript of April 4   2025 Meeting of Creditors (redacted)   Page 2 of 77

Exhibit 1
24-Creditors Meeting Q 04 25

1               A P P E A R A N C E S

2

  CHAPTER 7 TRUSTEE:
3
       Mr. Mark A. Weisbart
4

5  COUNSEL FOR CREDITORS MMWKM ADVISORS, LLC, AND KEN
  MORAIF:
6
       Mr. Patrick Yarborough
7      FOSTER YARBOROUGH, PLLC
       917 Franklin Street, Suite 220
8      Houston, Texas  77002
       Tel: (713) 331-5254
9

10  COUNSEL FOR DEBTOR JOSEPH ANTHONY DOWDALL:

11       Mr. Gerrit M. Pronske
         SPENCER FANE, LLP
12       5700 Granite Parkway, Suite 650
         Plano, Texas  75024
13       Tel: (972) 324-0301

14

  COURT-APPOINTED RECEIVER IN A DALLAS COUNTY
15  DISTRICT COURT CASE JUDGMENT AGAINST
  JOSEPH DOWDALL:
16
       Ms. Dana Elise Lipp
17       LIPP LEGAL, PLLC
         2591 Dallas Parkway, Suite 300
18       Frisco, Texas  75034
         Tel: (512) 775-3383
19

20  ALSO PRESENT:

21        Mr. Joseph Anthony Dowdall, Debtor

22

23

24

25

LEXITAS

Exhibit 1

341 Creditors Meeting 04-04-25

1                    I N D E X

2                                              PAGE

3  Chapter 7 Trustee Calls Case...............   4

4  JOSEPH ANTHONY DOWDALL

5      Examination by Trustee Weisbart........   5

6      Examination by Mr. Pronske............   7

7      Examination by Trustee Weisbart........   8

8      Examination by Mr. Yarborough..........  25

9      Examination by Ms. Lipp................  54

10     Examination by Trustee Weisbart........  56

11     Examination by Ms. Lipp................  60

12     Examination by Mr. Yarborough..........  62

13     Examination by Trustee Weisbart........  62

14 Adjournment...............................  64

15 Court Reporter's Certification............  65

16

17

18

19

20

21

22

23

24

25

LEXITAS

```
 1              P R O C E E D I N G S

 2

 3              (341 AUDIO 04.04.25 #1)

 4              FEMALE SPEAKER:  All right.  Track

 5  No. 48, Joseph Dowdall, Case No. 24-42950.

 6              I have Patrick Yarborough listed.

 7  And, everybody else, if you'll please state your

 8  names.

 9              MR. DOWDALL:  Joseph Dowdall.

10              MR. PRONSKE:  Gerrit Pronske, attorney

11  for the debtor.

12              TRUSTEE WEISBART:  All right.  Mark

13  Weisbart, trustee.

14              Does anyone else want to appear in

15  this?

16              FEMALE SPEAKER:  Patrick does.

17              TRUSTEE WEISBART:  Can you state your

18  name, Mr. Yarborough, if you want to appear?

19              MR. YARBOROUGH:  Sure, of course.  My

20  name is Patrick Yarborough.  I'm here on behalf of

21  judgment creditors, MMWKM Advisors, LLC, and Ken

22  Moraif.

23              TRUSTEE WEISBART:  All right.

24              FEMALE SPEAKER:  Dana?

25              MS. LIPP:  Yes.  Sorry.  Dana Lipp.  I
```



1    was the Court-appointed receiver in a district

2    court case against Mr. Dowdall.

3            TRUSTEE WEISBART:  Okay.  Are you

4    appearing at this creditors meeting?

5            MS. LIPP:  Yes, I'm appearing for the

6    creditors meeting.  Thank you.

7            TRUSTEE WEISBART:  Mr. Dowdall, I'm

8    Mark Weisbart, the trustee.

9            MR. DOWDALL:  Yes, sir.

10            TRUSTEE WEISBART:  And let me swear

11    you in, if you'll raise your right hand.

12            This meeting has been continued -- or

13    excuse me.  Do you swear to tell the truth?

14            MR. DOWDALL:  Yes.

15            TRUSTEE WEISBART:  Okay.  This meeting

16    has been continued twice before, but we've

17    actually never conducted the meeting so today

18    we're going to conduct the meeting and hopefully

19    get it concluded.

20            JOSEPH ANTHONY DOWDALL,

21        having been first duly sworn, testified as

22                    follows:

23                    EXAMINATION

24    BY TRUSTEE WEISBART:

25        Q.  Mr. Dowdall, let's see.  Have you ever



```
 1  filed bankruptcy before?

 2       A.  No.

 3       Q.  Did you review your petition, schedules

 4  and statement of financial affairs before they

 5  were filed?

 6       A.  Yes.

 7       Q.  Are all of your assets identified in your

 8  bankruptcy schedules?

 9       A.  Yes.

10       Q.  Are there any changes you need to make to

11  your bankruptcy schedules, your statement of

12  financial affairs or your petition -- bankruptcy

13  petition?

14       A.  No.

15       Q.  Okay.  For the record, we have a copy of

16  your driver's license and Social Security card,

17  your '23 tax return.  Have you prepared and filed

18  your '24 return?

19       A.  Yes.  And actually did that inadvertently

20  and didn't realize the timing of it so I actually

21  have a refund for the '24 tax return that I'm

22  going to have to account for, you know, to apply

23  towards the creditors.

24       Q.  What is the amount of the refund?

25       A.  It's roughly $7,000.
```



1        Q.   All right.  And have you received it yet

2    or --

3        A.   No.

4        Q.   Okay.  Well, you'll need to turn that

5    over when you -- when you get it.

6        A.   I understand.

7        Q.   All right.  And do you make any domestic

8    support obligation payments such as child support?

9        A.   I do not.

10            TRUSTEE WEISBART:  All right.  I'll go

11   ahead and turn the meeting over to your counsel,

12   Mr. Pronske.

13                    EXAMINATION

14   BY MR. PRONSKE:

15       Q.   Mr. Dowdall, can you briefly tell the

16   trustee the reasons that you filed bankruptcy?

17       A.   Yes.  So in February of 2020, I

18   voluntarily resigned from Retirement Planners of

19   America and was subsequently sued for roughly

20   $5 million and went to arbitration and ultimately

21   had a judgment against me for, you know, roughly

22   $3 million.

23            After attempting to negotiate with the

24   creditors for two years and not getting anywhere

25   and they began to threaten my wife, I decided that

1   the best option would be to declare bankruptcy.

2       Q.   And you've heard the testimony today in

3   the other cases relating to inheritance.  Do you

4   have any --

5       A.   Yes.

6       Q.   -- any inheritance?

7       A.   None that I'm expecting.

8       Q.   And you understand that if you have any

9   within 180 days after filing bankruptcy that you

10  need to turn that over to the trustee?

11      A.   I understand, yes.

12      Q.   That's all I've got.

13      A.   Okay.

14                      EXAMINATION

15  BY TRUSTEE WEISBART:

16      Q.   All right.  Let me just walk through your

17  schedules very quickly.  How long have you lived

18  in your home in Frisco?

19      A.   Since 2011.

20      Q.   Does it have a mortgage on it or do you

21  own it outright?

22      A.   No mortgage.

23      Q.   Okay.  Did it ever have a mortgage on it?

24      A.   It did.

25      Q.   When was the mortgage paid off?



```
 1        A.   Roughly 2017.

 2        Q.   Okay.  You have two vehicles, a Ford

 3   Explorer and a Tesla Y?

 4        A.   Yes.

 5        Q.   Okay.  And are those financed?

 6        A.   They are not.

 7        Q.   And did you acquire -- when did you

 8   acquire those roughly?

 9        A.   The Tesla was December of 2020, I

10   believe, and the Ford was August of 2020, I

11   believe.

12        Q.   And did you pay cash for those?

13        A.   Yes.

14        Q.   Do you have any valuable heirlooms,

15   antiques, collectibles, any artwork, jewelry,

16   anything worth $5,000 or more?

17        A.   No.

18        Q.   Same question as to electronics.  Any

19   valuable electronics, anything worth $5,000 or

20   more?

21        A.   No.

22        Q.   You scheduled your wedding ring for under

23   $500.  You actually scheduled it for a hundred.

24   Do you think that's a fair value?

25        A.   I think that's, yes, conservative.  No.
```



Exhibit 1

```
 1   It's -- yes.  I'm sorry.  It's fair value.  It's

 2   probably worth $50.

 3       Q.  All right.  You scheduled one account, a

 4   checking account, at Wells Fargo.  Is that

 5   correct?

 6       A.  Yes.

 7       Q.  Is that the only account you have?

 8       A.  Yes.

 9       Q.  And that's an account that is an account

10   in your name?

11       A.  I believe it was a joint account.

12       Q.  Okay.

13       A.  It had my name on it.

14       Q.  Okay.  Do you -- well, what's the last

15   four digits of the account number on that?

16       A.  I don't recall exactly, but I might have

17   the checkbook here.  It was the only one.  I know

18   I put it on the schedule so I'm not having much

19   luck finding the checkbook, but it was the one

20   listed on the schedule that I put on there.  That

21   was the one that had my name on it.

22       Q.  Okay.  Hang on.  Let me see if I can find

23   it real quick.

24       A.  Do you show [Confidential] as the last four?

25       Q.  I'm looking.  Yes, [Confidential] has a joint
```

LEXITAS™

Exhibit 1

```
1   account in your name and it said Layla Ann?

2        A.  Layla.

3        Q.  Layla?

4        A.  Yes, yes.

5        Q.  All right.  Okay.  That's the account

6   we're referring to?

7        A.  Yeah.

8        Q.  Okay.  All right.  You have a life

9   insurance policy that has no cash for under

10  value -- oh, wait.  I'm on the wrong case.  Excuse

11  me.

12            All right.  You have an IRA with

13  631,000.  Is that correct?

14       A.  Yeah.  I believe that's the -- one IRA --

15  one Roth IRA.

16       Q.  Okay.  Have you contributed to the IRA in

17  the year prior to bankruptcy?

18       A.  I don't believe so, no.

19       Q.  And you show 529 plans for two children.

20  Correct?

21       A.  That's correct, yes.

22       Q.  Have you contributed to those within the,

23  say, two years prior to bankruptcy?

24       A.  No, nothing -- maybe a couple of dollars,

25  but I don't recall contributing anything
```



Exhibit 1

```
 1   significant to those in the two years prior.

 2       Q.  All right.  You listed -- you're married.

 3   Correct?

 4       A.  That's correct.

 5       Q.  Did you list all of the assets of you and

 6   your wife jointly, in other words, assets that

 7   you've acquired during the marriage?

 8       A.  Yes.

 9       Q.  Okay.  Does she have any assets that

10   aren't listed under bankruptcy status?

11       A.  Yes.

12       Q.  What are those assets?

13       A.  Well, she has her own bank account.

14       Q.  Okay.

15       A.  Clothing, jewelry, things like that.  She

16   also has her own IRA account and an investment

17   account as well.

18       Q.  And what account?

19       A.  Investment account.

20       Q.  Investment account?

21       A.  Yes.

22       Q.  Okay.  Where is the investment account

23   at?

24       A.  Charles Schwab.

25       Q.  And the bank account, that's a -- that's
```



Exhibit 1

```
 1  a Wells Fargo account.  Right?

 2       A.  Yes, sir.

 3       Q.  And where is the IRA at?

 4       A.  Charles Schwab.

 5       Q.  Charles Schwab.  Okay.

 6       A.  Oh, and then there's a car.  I think

 7  she -- she has a car as well.

 8       Q.  What car?

 9       A.  That's not one of the two cars that was

10  listed.  So that was a car that we shared the

11  information with you on, the check, that was

12  purchased for my daughter.

13       Q.  That check that was made --

14       A.  Honda.  I believe it's Honda McKinney,

15  something like that.

16       Q.  That's for Bella?

17       A.  Yes.

18       Q.  I'm sorry.  I'm going to note that.  And

19  I assume she drives, right, your child for whom

20  the car was purchased?

21       A.  That's correct.

22       Q.  Okay.  Is she in college or out of school

23  or --

24       A.  She'll graduate in May.

25       Q.  Okay.
```

888-893-3767
www.lexitaslegal.com



Case 24-42950   Doc 42-1   Filed 05/20/25   Entered 05/20/25 08:28:27   Desc Exhibit
Transcript of April 4   2025 Meeting of Creditors (redacted)   Page 14 of 77

Exhibit 1
341 Creditors Meeting 04.04.25

```
1        A.   From high school.

2        Q.   From high school.  Okay.

3        A.   Yes, sir.

4        Q.   Okay.  And why was the car purchased?

5        A.   Well, ultimately -- you know, she's very

6   involved in theater and has a lot of outside

7   school activities so she needed a car to be able

8   to get back and forth.

9             My wife has started working, you know,

10  and has some volunteer obligations as well so the

11  car allowed Bella to, you know, get back and forth

12  to theater practice, school.  She also drives her

13  daughter -- drives my other daughter, her sister,

14  to church functions, things like that.

15       Q.   Okay.  And this was a purchase for cash.

16  Correct?

17       A.   That's correct.

18       Q.   Okay.  There was no trade-in or anything

19  like that?

20       A.   No, sir.

21       Q.   Do you have a copy of the sales agreement

22  that you could provide me if I need to see it?

23       A.   Yeah.  I think we provided you with the

24  document.  The latest email had the --

25       Q.   I think it was a receipt or something
```



Exhibit 1

```
 1   like that.
 2        A.   There's two -- there are two emails.  One
 3   was -- or there were two documents.  One was an
 4   email and one was the -- what the dealership
 5   provided me like a -- it's a real weird form, but
 6   it was already provided so I think that will show
 7   that the -- I forget the exact term on the form,
 8   but that's what I have.
 9             I have the receipt and then I have the
10   other document which might be like proof of -- I
11   don't know -- title or something.
12        Q.   Okay.
13        A.   But, again, that was -- Layla purchased
14   that.
15        Q.   All right.  We -- you work at Worth Asset
16   Management.  Is that correct?
17        A.   Yes, sir.
18        Q.   And your wife is a substitute teacher?
19        A.   Yes.
20        Q.   Is that still the case?
21        A.   Yes.
22        Q.   Okay.  Does your wife have any other
23   employment or sources of income aside from her
24   substitute teaching?
25        A.   No.
```



Exhibit 1

```
 1        Q.  Can you sue anyone to recover money or

 2   property?

 3        A.  No.

 4        Q.  Do you anticipate an inheritance in the

 5   next six months?

 6        A.  I do not.

 7        Q.  Your source of -- sole source of income

 8   is with Worth.  Is that correct?

 9        A.  Yes, sir.

10        Q.  Do you have any other sources of income?

11        A.  No, sir.

12        Q.  Have you transferred, sold or given away

13   in the last two years any property of value?

14        A.  No.

15        Q.  And I say value.  I mean, $5,000 or more.

16   The answer is still no?

17        A.  That's correct.  No.

18        Q.  Okay.  Can you sue anyone to recover

19   money or property?

20        A.  No.

21        Q.  Do you have a storage unit?

22        A.  Yes.

23        Q.  What's maintained at the storage unit?

24        A.  Stuff from when my kids were little,

25   nicknacks, some luggage, I think, a bed frame.
```

LEXITAS

Exhibit 1

1        Q.   Anything of extraordinary value, say

2   $5,000 or more?

3        A.   No.

4        Q.   All right.  You identified, as you said,

5   your wife's bank account or accounts.  Did you --

6   I believe I was told that you signed a separate

7   property agreement with your wife?

8        A.   That's correct.

9        Q.   And is that a copy of -- can I get a copy

10  of that?

11             MR. PRONSKE:  I'm going to send you a

12  copy of it this afternoon.

13             TRUSTEE WEISBART:  Okay.  Great.

14  Thanks.

15        Q.   (BY TRUSTEE WEISBART)  And when was that

16  executed?

17        A.   I believe in 2022.

18        Q.   And why did you execute that agreement?

19        A.   You know, I was going through the lawsuit

20  and my wife just wanted to make sure that her

21  assets were identified as her assets due to the --

22  you know, due to the lawsuit.  I'll just --

23  without adding too much hyperbole there.  It was a

24  very challenging time.  But ultimately she just,

25  like I said, wanted to make sure her assets were

LEXITAS

 1   identified.

 2       Q.  Okay.  And so -- and I obviously will

 3   look at the agreement when it's sent to me, but

 4   does it essentially say, Here's your assets and

 5   here's my assets and what's yours is yours and

 6   mine is mine as separate property"?

 7       A.  I'm not a lawyer.

 8       Q.  Okay.

 9       A.  So there's a lot of legal language in

10   there, but -- I guess I would defer to Gerrit, but

11   that's my understanding.

12       Q.  Okay.  Well, we'll look at the document.

13   And if I have any follow-up questions, I'll work

14   with Gerrit to get answers on that.

15             MR. PRONSKE:  And your

16   characterization of it is essentially correct.

17             TRUSTEE WEISBART:  Okay.  Thank you,

18   Gerrit.

19       Q.  (BY TRUSTEE WEISBART)  All right.  So is

20   one of the separate assets the Wells Fargo account

21   that is in her name -- your wife's name?

22       A.  Yes.

23       Q.  It ends ▮▮▮▮▮?

24       A.  Yes.

25       Q.  And you've provided me those account



Exhibit 1
4.4 Creditors Meeting 04.28

1   statements for the last -- it looks like the last

2   two years or so, and I appreciate you providing

3   those.

4        A.   You're welcome.

5        Q.   It looks like your monthly income from

6   Worth Asset is deposited into those accounts and

7   has been for a while.  Is that -- is that correct?

8        A.   Yes, that's correct.

9        Q.   And why is that?  Why do those funds --

10  why are those funds being deposited into your

11  wife's account?

12       A.   Well, I guess for the most part she was

13  paying, you know, the bills.  So my wages, my

14  income, which I had moved into that account as a

15  result of the lawsuit and my understanding that

16  wages would be protected -- so they were moved

17  into that account to help cover the month -- the,

18  you know, family household bills.

19       Q.   When did you start doing that?  When did

20  you start depositing your wage checks into -- or

21  wage payments into her account -- her Wells Fargo

22  account?

23       A.   I don't -- I don't remember the exact

24  date of that.  It's been a while -- it had been a

25  while, but I don't recall the date, but I'm sure



Exhibit 1

341 Creditors Meeting 00-04-26

1   it's in the statement.

2       Q.   Was it done to avoid the judgment

3   creditor from seeking recovery out of your

4   account?

5       A.   Well, yeah.   I mean, my understanding was

6   that -- you know, so I took a pretty big pay cut

7   to become an employee of Worth Asset Management

8   and -- based upon the understanding that it was

9   legal for me to do so and have wages.   So the hope

10  was that those wages would be protected as a

11  result of what my understanding of Texas state law

12  is.

13      Q.   Okay.   And you're not a signatory to this

14  account.   Right?

15      A.   No.

16      Q.   It looks like virtually all the money

17  that goes into that account come from your wages.

18  Is that a fair characterization?

19      A.   Yes.

20      Q.   I asked questions about a Freedom life

21  insurance premium.

22      A.   Yes.

23      Q.   And it's about $1433.79.   And Gerrit

24  indicated that that is a health insurance payment?

25      A.   That's correct.



Exhibit 1

```
 1        Q.   Even if it says life insurance.  Okay.

 2        A.   Yeah.  It's funny.  It's a division of

 3   United Health.  I don't know why they call it

 4   that, but that's our -- that's our monthly health

 5   and -- family health insurance premium.

 6        Q.   Okay.  And then there are monthly

 7   deductions, almost weekly, it looks like, to pay a

 8   Capital One credit card.  Is that right?

 9        A.   Yes.

10        Q.   Do you --

11        A.   Well, yes.  I'm sorry.  Yes.

12        Q.   Okay.  Did you have any other credit

13   cards in your name or just --

14        A.   As of December -- as of the date of

15   filing, no.

16        Q.   Well, before the date of filing, did you

17   have any?

18        A.   No, no, but after I filed, that credit

19   card has been closed and I can no longer have

20   access to it.  But as of that day and the months,

21   the years before, that was the only credit card I

22   had.

23        Q.   Was that the only credit card you had as

24   a household?

25        A.   Yeah.  My wife signed up for an American
```



Exhibit 1

```
 1  Airlines credit card, you know, maybe like October

 2  of last year or something for the miles, but for

 3  all intent and purpose we didn't use that card.

 4  She just got the bonus miles.  So up through

 5  filing, Capital One was every -- just about

 6  99.9 percent of everything.

 7      Q.  Okay.  And it looked like you both have

 8  cards.  In other words, you could use that credit

 9  card to charge and she could use the credit card

10  to charge.  Is that correct?

11      A.  That's correct, yes.

12      Q.  I asked for credit card statements and

13  you weren't able to get them all.  In particular,

14  we -- the '24 statements were not -- you couldn't

15  get access to them and there were three or four

16  months in '23 that were --

17      A.  Yes.  So based upon your request, I

18  called Capital One and spoke with a rep there and

19  they said their policy is once the credit card is

20  turned off, for lack of a better term, they

21  wouldn't even email me old statements.

22          Their explanation was confusing to me,

23  but it had something to do with -- on the

24  statement, it would say that I was a debtor or

25  something.  I don't really understand.  So they
```



Exhibit 1

341 Creditors Meeting 04.04.25

```
 1   wouldn't give it to me.

 2              The ones that I had on file were ones

 3   that I believe I saved initially to provide to the

 4   receiver so I still had those as old documents.

 5        Q.  All right.  The -- in 2024, and I'll just

 6   ask you from your recollection, did you -- you

 7   used the credit cards, I assume, to pay your

 8   household living expenses.  Is that correct?

 9        A.  That's correct, yes.

10        Q.  Did you use them for any other purpose

11   such as extraordinary purchases to make

12   improvements to your home?

13        A.  No.

14        Q.  Did you take family vacations on them?

15        A.  We did take vacation and probably the

16   flights were purchased with the credit -- yeah.  I

17   can say with certainty the flights were purchased

18   with the credit card, but it was nothing

19   extraordinary.  I mean, it was just standard

20   living stuff.

21        Q.  Within three months of filing bankruptcy,

22   did you use those credit cards to acquire any

23   property that you're claiming as exempt?

24        A.  No.

25        Q.  Okay.  Have you transferred any funds or
```



Exhibit 1

1  assets to friends, family members or relatives

2  within a year prior to bankruptcy?

3      A.  No.

4      Q.  All right.  So the credit card statements

5  that I don't have access to yet, I think what

6  you're telling me is for the most part they have

7  looked pretty much the same --

8      A.  Yeah.

9      Q.  -- as far as the credit card statements

10  that you -- that you've given me so far?

11      A.  Yeah.  No, it's nothing done in an

12  extraordinary manner to -- in those other months

13  other than what you saw in the activity.  It would

14  be pretty consistent across the board, you know,

15  Netflix bill, you know, et cetera, groceries,

16  things like that.

17      Q.  And in round figures, the balance of

18  funds in that account, the ███████ account, at the

19  time of filing was around 113,000.  Is that right?

20      A.  Yes, sir.

21      Q.  But there was a check outstanding to

22  Gerrit's firm.  Is that correct?

23      A.  That's correct.

24      Q.  All right.

25          TRUSTEE WEISBART:  I'm going to go



Exhibit 1

```
 1   ahead and see if anybody else has any questions.

 2   I'm going to grab a couple of my notes while

 3   that's going on.

 4            Anybody else have any questions?

 5            MR. YARBOROUGH:  Yes, Trustee

 6   Weisbart, I do --

 7            TRUSTEE WEISBART:  All right.

 8            MR. YARBOROUGH:  -- on behalf of

 9   credit MMWKM.

10            TRUSTEE WEISBART:  Go ahead.

11            MR. YARBOROUGH:  Okay.  Great.

12            I just sent a request to share my

13   screen just to stay organized but just to -- just

14   to make sure we're on the same page.

15                      EXAMINATION

16   BY MR. YARBOROUGH:

17      Q.  Mr. Dowdall, nice to see you today.  To

18   confirm, in the arbitration award that was entered

19   as a judgment that we discussed earlier, were you

20   found liable for breach of fiduciary duty?

21            MR. PRONSKE:  I'm going to step in and

22   I'm going to answer that question because it's a

23   legal question.  And the answer to that question

24   is he was not found liable for a breach of

25   fiduciary duty while being in a -- or fraud or
```

Exhibit 1

```
 1   defalcation while acting in a fiduciary capacity.
 2              MR. YARBOROUGH:  And I -- Trustee
 3   Weisbart, I object to the legal conclusion.  I'm
 4   just asking for a factual answer to the question.
 5   The legal characterization is something
 6   Mr. Pronske is free to discuss with you offline.
 7              MR. PRONSKE:  I'm not going to -- I'm
 8   not going to let him answer that question because
 9   you're asking him a question that's a legal -- a
10   pure legal conclusion.  There's nuances, as you
11   know, to these issues.
12              And the issue in bankruptcy is was he
13   acting in fraud or defalcation while acting in a
14   fiduciary capacity, and the answer to that
15   question is no.
16              MR. YARBOROUGH:  Okay.  Thank you,
17   Gerrit.
18       Q.  (BY MR. YARBOROUGH)  Just to confirm,
19   though, there was a breach of fiduciary duty.  You
20   dispute the characterization as defalcation.
21   Correct?
22              MR. PRONSKE:  Mr. Dowdall, if you
23   understand the nuances, you can go ahead and
24   answer that.  But if you don't, I would ask you to
25   say to your understanding you do not know.
```



Exhibit 1
24-Creditors Meeting 04.25

1        A.  I do not know.

2        Q.  (BY MR. YARBOROUGH)  That's fine.  Okay.

3   Well, Mr. Dowdall, this is a factual question, not

4   a matter of legal conclusions.  Here in

5   Paragraph 6 of the second amended arbitration

6   award that was entered as the final judgment, it

7   finds --

8        A.  I'm sorry.  Before we go on, Patrick, can

9   I ask you to make sure that you do not share any

10  personal information on the screen like you had

11  done last time?  So --

12       Q.  You mean like the account numbers that

13  you just stated on the record?

14       A.  Yeah.  I think we stated the last four

15  digits of the account numbers, which, as I'm sure

16  you're aware, is not a full account number.  But

17  just going forward --

18       Q.  I'm happy to --

19       A.  -- do not share --

20       Q.  I'm happy to do that, Mr. Dowdall.

21       A.  Okay.  I don't want you to share any

22  personal information again.

23       Q.  Okay.  I won't.  And, by the way, I'm not

24  going to share any personal information like

25  credit card numbers, account numbers, et cetera.



 1  Okay?

 2      A.   Okay.

 3      Q.   Okay.  Mr. Dowdall, in this arbitration

 4  award, you were found as a factual matter to have

 5  destroyed texts and other evidence.  Is that

 6  correct?

 7           MR. PRONSKE:  Again, you can show him

 8  the document if -- and, you know, you don't really

 9  need to ask, Patrick, because it's all in the

10  document, but show him the document if you're

11  going to ask him the question on it.  Otherwise, I

12  don't think he knows the answer.

13           MR. YARBOROUGH:  Okay.  I have showed

14  him the document.  It is shared.  And that's the

15  reason why I shared it is to make sure we're all

16  working --

17           MR. PRONSKE:  It cuts --

18           MR. YARBOROUGH:  -- with that

19  information.

20           MR. PRONSKE:  It cuts off at the

21  bottom where the $2 million number is circled

22  so...

23           MR. YARBOROUGH:  Sure.

24      Q.  (BY MR. YARBOROUGH)  Okay.  Let me -- let

25  me make the question very easy to answer.  Here in



1    Paragraph 6, you were found to be liable for -- or

2    you were found as a factual matter to have

3    destroyed texts and other evidence.  Is that

4    right?

5                    MR. PRONSKE:  It says what it says

6    right there and so you don't need to have a

7    theater here, Patrick.  It -- the document is very

8    clear and you're -- you don't need to ask him what

9    it says.

10                   MR. YARBOROUGH:  Mr. Weisbart, I ask

11   for you to instruct Mr. Pronske not to make

12   speaking objections anymore.

13                   MR. PRONSKE:  This isn't court,

14   Patrick.

15                   MR. YARBOROUGH:  This is

16   Mr. Weisbart's --

17                   TRUSTEE WEISBART:  Yeah.

18                   MR. YARBOROUGH:  He's in charge of it.

19                   TRUSTEE WEISBART:  It is in court

20   and -- I mean, Gerrit, just state your objection

21   as succinctly as you can and we'll go from there.

22                   MR. YARBOROUGH:  Okay.  Can he answer

23   so we can move on, Mr. Pronske?

24                   MR. PRONSKE:  The answer is -- I

25   object.  You're asking him -- it just says what it

LEXITAS

Exhibit 1

```
 1   says.
 2            MR. YARBOROUGH:  Okay.  Mr. Pronske,
 3   this is on the record.  This is going to be seen
 4   by the Court.  I ask that you make your objection
 5   and allow Mr. Dowdall to answer because there's no
 6   judge here to sustain your objection.
 7            MR. PRONSKE:  Restate --
 8            MR. YARBOROUGH:  Make it for the
 9   record.
10            MR. PRONSKE:  Restate your question.
11            MR. YARBOROUGH:  Okay.  Thank you.
12       Q.  (BY MR. YARBOROUGH)  Mr. Dowdall, you
13   were found to have destroyed texts and other
14   evidence in the arbitration case.  Correct?
15       A.  That's what I'm reading on the screen.
16       Q.  Okay.  And it's true that you actually
17   admitted in that proceeding that you destroyed
18   texts and other evidence.  Correct?
19       A.  My -- the way I remember that and the
20   actuality is that the text messages that I deleted
21   were deleted prior to the litigation so I don't
22   agree with that.
23       Q.  Okay.  But -- I understand.  Thanks for
24   that clarification.  So, Mr. Dowdall --
25       A.  You're welcome.
```

Exhibit 1

341 Creditors Meeting 04.04.25

1     Q.  -- you did delete them.  You admit that.

2     Right?

3     A.  Yeah.  I believe -- yes, I deleted text

4     messages, yes.

5     Q.  That's right.  Okay.  Just a yes or no

6     answer is fine.  Okay.  Even though you dispute

7     that you are aware litigation could reasonably be

8     anticipated, the arbitration panel nevertheless

9     did make that conclusion.  Right?

10           MR. PRONSKE:  Same objection.  It says

11    what it says in No. 6.

12      Q.  (BY MR. YARBOROUGH)  Okay.  Go ahead,

13    Mr. Dowdall.  That is what it says in No. 6.

14    Right?

15      A.  That's what I read on No. 6.

16      Q.  Okay.  Good.  Okay.  And just to be

17    clear, you were held liable for breaching your

18    duty not to take client accounts from RPOA, also

19    known as MMWKM Advisors, LLC, without paying for

20    them.  Right?

21           MR. PRONSKE:  That's not --

22      A.  Yeah.  That's not accurate.

23           MR. PRONSKE:  I'm going to instruct

24    you --

25           MR. YARBOROUGH:  Mr. Pronske, you

LEXITAS

 1  weren't there.  You obviously don't see the

 2  document in front of us which says exactly what

 3  I'm saying or else I wouldn't be putting it in

 4  front of you.

 5          MR. PRONSKE:  There's nothing about

 6  accounts.

 7      Q.  (BY MR. YARBOROUGH)  Okay.

 8  Mr. Dowdall --

 9      A.  Where it says accounts --

10          MR. PRONSKE:  Yeah.  And I --

11  Mr. Yarborough, you --

12      Q.  (BY MR. YARBOROUGH)  I need --

13  Mr. Dowdall, I'm going to ask you very simple

14  questions and you don't need to worry about the

15  conclusions because your counsel is very capable,

16  but I need to -- answer questions and get them

17  answered and move on.  Okay?

18          MR. PRONSKE:  Yeah.

19          MR. YARBOROUGH:  Mr. Pronske, I

20  appreciate your objections.  Just state your

21  objection and allow the witness to answer.

22  There's no judge to sustain your objection.

23          MR. PRONSKE:  I'm going to make a

24  short objection here.  I object to these questions

25  where you're telling him that things are in the

Exhibit 1

341 Creditors Meeting 04.25

1   document that they're not, like accounts, and

2   you're trying to get some admissions from him, and

3   I'm going to tell Mr. Dowdall to answer these

4   questions I don't know or I don't understand

5   unless you have a full understanding of it because

6   this is an attempt to try to trick you.

7           MR. YARBOROUGH:  No, it's not,

8   Mr. Pronske.  And, by the way, admitting or

9   denying things is exactly what testimony is for.

10  It's on the record.

11          TRUSTEE WEISBART:  Mr. Yarborough,

12  just go ahead and ask your questions.  We can't be

13  here all day.

14          MR. YARBOROUGH:  I understand.  But

15  Mr. Pronske's -- I need your support here in the

16  proper nature of Mr. Pronske's objections.

17          TRUSTEE WEISBART:  Okay.  Go ahead.

18  Please ask your questions.

19          MR. YARBOROUGH:  Okay.  Thank you.

20      Q.  (BY MR. YARBOROUGH)  Okay.  Just to be

21  clear, Mr. Dowdall, I'm going to ask you a very

22  simple factual question.  You did not pay any sum

23  of money for the accounts that you took from RPOA

24  that led to the arbitration.  Correct?

25          MR. PRONSKE:  Same objection.  It's



Exhibit 1

1   calling for a legal conclusion about accounts and

2   that's not in the document and same instruction to

3   the witness.

4        Q.  (BY MR. YARBOROUGH)  Mr. Dowdall, did you

5   pay anything to RPOA for the client accounts that

6   you received after leaving?

7        A.  I don't understand.

8        Q.  Did you pay anything to RPOA after you

9   left?

10        A.  I have issue with you saying that I took

11   accounts.  I'd like to see in the award where it

12   says anything about taking accounts.

13             MR. YARBOROUGH:  Objection.

14   Nonresponsive.

15        Q.  (BY MR. YARBOROUGH)  Mr. Dowdall, I'm

16   asking you a factual question.  It has nothing to

17   do with the award.  Did you ever pay RPOA --

18        A.  Patrick, the basis of your question is

19   you said that I was found to have taken accounts.

20             MR. YARBOROUGH:  Objection.

21   Nonresponsive.

22        A.  I'm answering that question.

23        Q.  (BY MR. YARBOROUGH)  I'm asking a

24   different question.  If someone makes an

25   objection, I'm allowed to ask a different question



1   which is simpler and doesn't contain the preamble.

2   Understood?

3       A.  No.  What do you mean by preamble?

4       Q.  Okay.  Mr. Dowdall, I'm asking you, have

5   you ever paid RPOA anything since you left?

6       A.  I left in February of 2021 so it's been

7   over four years.  Not to my recollection.

8       Q.  Okay.  Mr. Dowdall, I'm --

9       A.  Yes.

10      Q.  -- showing you now what has been -- what

11  your attorney, Mr. Pronske, here today sent us as

12  your revised employment agreement on April 23rd,

13  2024.  Do you see that?

14      A.  I do see that.

15      Q.  Okay.  So --

16      A.  Well, I see that but -- I'm sorry.  I

17  don't see the revised agreement.  I see an email

18  that says "attached."

19      Q.  Right.  And the revised agreement is on

20  the second page.  I'm just walking us through for

21  people who haven't seen it yet.  This is it.

22  Right?

23      A.  Well, I haven't read the whole document,

24  but it looks familiar.

25      Q.  Okay.  This is the same document that you



1    confirmed was authentic in your deposition on

2    November 6th.  Mr. Dowdall, in this agreement --

3         A.  Yes.

4         Q.  This -- so just to confirm, this is

5    really sign posting.  This is to help you

6    remember.  This is the agreement -- the investment

7    advisor employment agreement that you first

8    entered to take the pay cut you told Mr. Weisbart

9    about.  Correct?

10        A.  I'm not entirely comfortable answering

11   because I don't know the full agreement that

12   you're referencing here.

13        Q.  Okay.

14        A.  I don't see the entire thing.  I don't

15   see my signatures on there.

16        Q.  Okay.

17        A.  Patrick, I'm trying to do the best I can.

18   I know you want to -- you and your --

19        Q.  I'm just trying to do my job,

20   Mr. Dowdall.  We just --

21        A.  Well --

22        Q.  Here's your signature.

23        A.  -- you're talking about your doing your

24   job, yes.

25        Q.  Yes.  I'm just doing my job here.  Okay.



Exhibit 1

1   Your job is just to answer a question.  This is

2   the agreement that you signed in connection with

3   the pay cut that you told the trustee about to

4   change your pay to wages that you consider exempt.

5   Correct?

6       A.  That's my recollection, but it's been a

7   little while.

8       Q.  Okay.  That's all I need.  Okay?  I just

9   need a straightforward answer.

10          Okay.  So here we go.  Here in this

11  agreement that your attorney provided to us that

12  you've confirmed the authenticity under oath

13  before, it says here under salaries, fee and lien,

14  that employer agrees to pay IAE -- that's you -- a

15  salary on a pro rata monthly basis based on an

16  annual salary of 350,000.  That is the amount of

17  your annual salary from that point until today.

18  Correct?

19      A.  That was the agreement that I had signed.

20  And, again, I'm not able to look over this entire

21  agreement to validate its authenticity.

22      Q.  Okay.

23      A.  But when I signed --

24      Q.  This established your salary of --

25      A.  Patrick, can I --



1     Q.   -- 350,000.  Right?

2     A.   -- speak, please?  Thank you.

3          When I signed the agreement, yes, the

4     agreement was to have a salary of $350,000 paid

5     monthly.

6     Q.   Okay.  Prior to that, you didn't have a

7     salary agreement of $350,000.  Correct?

8     A.   That's correct.

9     Q.   Okay.  Prior to that, you were paid fees

10    based on the amount of fees received by WAM for

11    your accounts.  Correct?

12    A.   It was a calculation.  And I'd have to go

13    back and review the calculation, but that's the

14    broad sense of my understanding, yes.

15    Q.   Okay.  So before you had -- you had fees

16    that were paid according to a formula agreed on by

17    the parties.  And from this point forward, you had

18    a salary of 350,000.  Is that right?

19    A.   Yes.

20    Q.   Okay.  So now it says here -- where I

21    highlighted, it says, "All indebtedness of IAE to

22    employer shall be considered a prior lien against

23    the book of business to IAE."

24          At this point where you signed this,

25    the book of business was referred to as your book



Exhibit 1
341 Creditors Meeting 04.4.25

1  of business.  Right?

2       A.  I'm sorry?  Can you repeat the question?

3       Q.  You owned a book of business that your

4  employer, WAM, could have a prior lien against

5  when you signed this agreement.  Right?

6            MR. PRONSKE:  I'm going to object to

7  the question asking him for a legal conclusion --

8       A.  No.  That's --

9            MR. PRONSKE:  -- of what he knows and

10  only -- the witness should only answer if you

11  understand the nuances of the legal issues.

12       A.  I don't understand.  There's way too much

13  legal in there for me to -- as a layman to

14  understand to answer your question intelligently.

15       Q.  (BY MR. YARBOROUGH)  Okay.  Did you

16  prepare this agreement or did WAM prepare this

17  agreement?

18       A.  I can't speak -- I can speak to that I

19  did -- I did not prepare the agreement.  I don't

20  know who did.

21       Q.  Okay.  So did you hire an attorney to do

22  this?  I'm not asking what you talked about with

23  your attorney.  I'm just asking who provided this

24  agreement to whom.  Okay.  Did you present this to

25  WAM?

Exhibit 1

1       A.   I'm pretty sure I just answered that

2    question.

3       Q.   Okay.   My question is, did WAM present

4    this to you or the other way around?

5       A.   It was presented to me.

6       Q.   Okay.   So this is WAM's agreement.

7       A.   I can't speak to what WAM does.   I can

8    only speak to the question of whether or not it

9    was presented to me.

10      Q.   All right.   That's fine.   Okay.   So just

11   to make clear, your attorney, Mr. Pronske, we've

12   also pretty -- you know, gone over this in your

13   deposition -- on May 3rd, 2024, provide --

14   provided us a revised employment agreement between

15   Joseph Dowdall and Worth Asset Management.   Right?

16      A.   I see an email here that says that

17   something was attached.

18      Q.   Okay.   But your lawyer would never send

19   me something that wasn't authentic.   Right?

20      A.   I don't know how to answer that question.

21      Q.   He wouldn't.   I know your lawyer.   He's a

22   good person.   He wouldn't do that.

23           Okay.   So with that behind us, this is

24   an agreement with the same start date as the last

25   one, right, April 1st, 2024?



```
 1                    And I'm just going to show that to you
 2   so everybody's working from the same information.
 3   They have the names --
 4        A.  I see the two documents.  You've
 5   highlighted the same date.
 6        Q.  Okay.  So they -- they're effective the
 7   same date, right, based on that?
 8        A.  Again, I'm hesitant to answer questions
 9   because the legal language within the document is
10   beyond my understanding or may be beyond my
11   understanding, but I do see the same date is
12   highlighted.
13        Q.  Okay.  So in the revised agreement, the
14   date wasn't changed.  Right?
15        A.  I see the same date is highlighted in
16   both documents.
17        Q.  Yes or no would be fine, but obviously
18   you agree this is the correct document so we don't
19   need to dwell on that.  Okay.  Here it says --
20        A.  I said I didn't agree to, but okay.
21        Q.  Excuse me?
22        A.  I don't believe -- I don't recall
23   agreeing to the statement you just said that I --
24        Q.  Anyway, you --
25        A.  -- agreed to.
```

Exhibit 1

1      Q.   You produced -- your lawyer produced us

2    authentic versions of your employment agreement.

3    That's not in dispute so we don't need to ask you

4    that part.

5      A.   Okay.   Thank you.

6      Q.   Okay.   Here it says, under salary, fees

7    and lien, on Page 7 -- or it's numbered Page 6,

8    and we went over in the prior version.   Here,

9    instead of saying, as it did in the prior version,

10   book of business, it says "WAM accounts serviced

11   by IAE."   You see that?

12     A.   I can see the part that you've

13   underlined, yes.

14     Q.   Okay.   So it changed from book of

15   business of IAE to WAM's accounts serviced by IAE.

16   Right?

17     A.   I can see that, yes.

18     Q.   Okay.   Now, Mr. Dowdall, between the time

19   you executed the first contract provided to you by

20   WAM and this contract, you never signed an

21   agreement assigning the book of business

22   referenced in the first contract to WAM, did you?

23     A.   I don't remember.

24     Q.   Okay.   But if you did, WAM would have it.

25   Right?



Exhibit 1
341 Creditors Meeting 04.04.25

 1      A.   Again, I can't speak to what WAM does or

 2   does not have.  I don't know what they have.

 3      Q.   Okay.  So which of these two do you agree

 4   with?  Do you think these are WAM accounts now or

 5   do you think that they're your accounts?

 6           MR. PRONSKE:  I'm going to (audio cuts

 7   out) the legal conclusion of -- when you say his

 8   or their, that implies ownership, and that's a

 9   legal conclusion.

10      Q.   (BY MR. YARBOROUGH)  Okay.  But just as a

11   factual matter, if you left, would WAM keep these

12   accounts?

13      A.   Again, I think I'd have to rely on the

14   complexity of that question and the legal

15   requirements that are required to answer that

16   intelligently and right now I don't know.

17      Q.   Okay.  But just to make it very clear, if

18   you retired, would you be entitled to any money

19   for those accounts from WAM?

20           MR. PRONSKE:  If you know.

21      A.   Yeah.  I don't know.

22      Q.   (BY MR. YARBOROUGH)  Maybe not.  Here's

23   another document that we reviewed at your

24   deposition.

25           And can you confirm for this


LEXITAS

1   proceeding that Worth Asset Management's ledger

2   for payments made to you with the account number

3   redacted by your request --

4       A.   Thank you.

5       Q.   Do you have any -- do you have any reason

6   to dispute the amounts that Worth Asset Management

7   says that it paid?

8       A.   I don't have any reason to dispute or

9   validate.

10      Q.   Same question except for the transactions

11  to LJ Dowdall Financial, LLC.  This was provided

12  by Worth Asset Management.  You've seen this

13  before.

14           You don't have any reason to dispute

15  any of the amounts paid to LJ Dowdall Financial,

16  do you?

17      A.   Again, I don't know.  Yeah, I don't know.

18      Q.   So the answer is the same.  No reason to

19  dispute?

20      A.   No.  The answer is I don't know.

21      Q.   Okay.  But you don't -- you don't -- you

22  can't tell me it's wrong.  Right?

23      A.   Yeah.  I think implied in I don't know is

24  I can't confirm it's right or wrong.

25      Q.   Understood.  Okay.  And this is a



Exhibit 1

24-42950 Corcoran Meeting 04.25

```
 1   check -- and, by the way, it's redacted.  Is that
 2   suggestion --
 3        A.  Thank you.  Yeah, I appreciate you not
 4   sharing personal bank account information for my
 5   wife.
 6        Q.  Well, this is a pass -- this is a
 7   password protected meeting, but I -- but I take
 8   seriously your -- you know, your request, and of
 9   course I'll go along with it.
10             Okay.  So, Mr. Dowdall, here you send
11   an email on April 17th, 2024, to Jim Clark
12   attaching a voided check for paying your salary
13   pursuant to your new agreement from April 2024.
14   Right?
15        A.  That's what I see on the screen.
16        Q.  Okay.  And here is the -- here is the
17   attached check that the funds for your salary have
18   been paid to you ever since it was provided to
19   Worth.  Right?
20        A.  I believe so.
21        Q.  Okay.  So here, as you sit here today
22   under oath, you can confirm that you have not
23   changed what account your salary is paid into at
24   Wells Fargo Bank.  Correct?
25        A.  Yeah.  I don't know.  I am unsure.
```



Exhibit 1

24-42950 Cranford Dowdall 04.04.

    1        Q.   Okay.   But nevertheless these monies have

    2   been paid since they started -- since they became

    3   salary to an account owned by your wife, Layla

    4   Dowdall, as a separate property account.   Correct?

    5        A.   Yes.

    6        Q.   Did you answer?

    7        A.   I did.

    8        Q.   Okay.   You said yes?

    9        A.   Well, again, it's, you know, a lot of

   10   time period here, but my recollection is that

   11   that's how they were paid.   Okay.

   12             TRUSTEE WEISBART:   Let me interrupt

   13   here a second.   I've got four meetings that

   14   started -- that were supposed to start at

   15   1:00 o'clock.   It's almost 1:40.   What I would

   16   like to do is adjourn this until -- for about 20

   17   minutes and take it -- and take it up again at

   18   2:00.

   19             Is that a problem with anyone?

   20             MR. YARBOROUGH:   No.   You're -- no.

   21   That's fine, Mr. Trustee.

   22             TRUSTEE WEISBART:   Okay.   And how much

   23   questioning do you think you have, Mr. Yarborough?

   24             MR. YARBOROUGH:   Really I could

   25   probably finish in the next three minutes.   I'm

LEXITAS

1   happy to do it in 20 minutes.

2           MS. LIPP:  Yeah.  And I may have a

3   couple of questions following Mr. Yarborough.

4           TRUSTEE WEISBART:  Well, let me take

5   up these other meetings because I -- my experience

6   is a couple of questions can go for about

7   15 minutes or so.  So let me -- let me adjourn

8   this.

9           Tara, are you on the line?

10          FEMALE SPEAKER:  Yes.

11          TRUSTEE WEISBART:  Okay.  We'll --

12          MR. YARBOROUGH:  How do we do this?

13  Do we just -- do we just come off the screen and

14  then come back on?

15          TRUSTEE WEISBART:  You can stay on the

16  screen and just mute and, you know, strike your

17  video or whatever to mute it, and your audio.

18          And then I'll just -- we'll just

19  recall it at 2:00 o'clock or when I finish up with

20  these other meetings.  It shouldn't take long but

21  it won't be before 2:00.  Okay.

22          MR. YARBOROUGH:  Okay.  Thanks.

23          MS. LIPP:  Thank you.

24

25



```
 1                    (341 AUDIO 04.04.25 #2)

 2               FEMALE SPEAKER:  All right.  We're

 3    back on record, Track No. 53, for Dowdall --

 4    Joseph Dowdall, Case No. 24-42950.

 5               State your names, please.

 6               I'm sorry.  I guess we've already done

 7    that.

 8               TRUSTEE WEISBART:  All right.  We're

 9    back on the record.  We adjourned for several

10    minutes to allow me to conclude my afternoon

11    docket.

12               Mr. Dowdall, you understand you're

13    still under oath?

14               MR. DOWDALL:  I do.

15               TRUSTEE WEISBART:  All right.

16    Mr. Yarborough, you were in the middle of your

17    questioning.

18               MR. YARBOROUGH:  Sure.

19        Q.  (BY MR. YARBOROUGH)  Okay.  So,

20    Mr. Dowdall, moving on to the tax return that you

21    just filed, that was for your 2024 income.

22    Correct?

23        A.  (Audio cuts out).

24        Q.  And what was your taxable income for

25    2024, roughly?
```

LEXITAS

Case 24-42950    Doc 42-1    Filed 05/20/25    Entered 05/20/25 08:28:27    Desc Exhibit
Transcript of April 4    2025 Meeting of Creditors (redacted)    Page 49 of 77

Exhibit 1
341 Creditors Meeting 04 04 25

1        A.   I don't remember.

2        Q.   What was it, approximately?   350-ish?

3        A.   Don't recall.

4        Q.   Okay.   But have you -- are you going to

5   produce that to the trustee?

6        A.   I think I'll provide whatever

7   Mr. Weisbart asks for so...

8        Q.   Okay.   But you haven't yet.   Right?

9        A.   I've given so many documents I don't even

10  recall.   I mean, the number of documents that I've

11  been required to provide, it's a lot so I can't

12  speak intelligently to whether or not I've given

13  it.   It's just been too many.

14       Q.   Understood.   Okay.   Have you produced

15  monthly bank statements from the account where

16  your WAM salary is paid to the trustee?

17       A.   Same answer.   I don't recall all the

18  documents.   I know I gave bank statements, but I

19  don't remember exactly which ones.

20       Q.   Okay.   Is it true that before you took

21  the pay cut to be on a salary that you were not

22  paid a salary?

23       A.   That's my recollection.

24       Q.   And just to return to the book of

25  business momentarily here, you don't have any



Exhibit 1

341 Creditors Meeting 04:25

1    documentation of a transfer of the book of

2    business that you provided to the trustee.  Right?

3        A.   Yeah.  As I've said, I've provided so

4    many documents I don't recall exactly which ones

5    I've provided.

6        Q.   Okay.  And I have one more document to

7    show you.  And if I may share my screen.

8             Okay.  So this is the worksheet that

9    we prepared for the amounts paid to LJ Dowdall

10   Financial and to you via either cashier's check

11   for via -- I think it was -- yeah, it was to

12   LJ Dowdall Financial, to you via cashier's checks

13   and to Layla Dowdall via auto pay.

14           Do you have any reason to dispute the

15   numbers in this table?

16       A.   I think based upon your inaccuracy with

17   previous statements, I'm hesitant to say anything

18   is accurate, so I'll say I don't know.

19       Q.   What have I been -- what have I said that

20   was inaccurate, sir?

21       A.   Well, you said that -- I mean, you said

22   that I took accounts, which never actually

23   happened.  Ms. Lipp lied in court and said that I

24   took accounts, which actually never happened.  So

25   that comes to mind off the top of my head but --



1   so because of that --

2              MS. LIPP:  Mr. Dowdall, I don't agree

3   with what you're saying about me.

4              MR. DOWDALL:  I'm sorry.  Can I

5   answer?

6              MS. LIPP:  I'm making that comment for

7   the record.

8              MR. DOWDALL:  Okay.

9        A.  So be --

10       Q.  (BY MR. YARBOROUGH)  So, Mr. Dowdall, you

11  didn't come up with anything that I said.  You

12  disagree that you took accounts.  Obviously that's

13  a characterization that we believe is true

14  legally, and that's a matter for the bankruptcy

15  judge to decide.

16             Okay.  So just to be clear, your

17  salary has not changed since it was established

18  under the contract that your lawyer produced to me

19  in April and May of 2024.  Correct?

20       A.  I don't recall.

21       Q.  Okay.  All right.  So I want to return to

22  the separate property agreement.  You never

23  produced the separate property agreement to the

24  receiver in the underlying court case.  Correct?

25             MR. PRONSKE:  It was never requested

LEXITAS

Exhibit 1

341 Creditors Meeting 04.04.25

1  by either of you, ever.

2      Q.  (BY MR. YARBOROUGH)  I'm asking, did you

3  produce it or not, Mr. Dowdall?

4      A.  You know, I hate to keep saying this, but

5  I've provided so many documents I don't recall

6  everything at this moment exactly what was or was

7  not provided.  I'm pretty sure that everything

8  that was requested was provided.

9      Q.  Okay.  So you haven't produced that

10  document to the trustee either, have you?

11      A.  The way you're asking that question is

12  insinuating that I did not provide it to the

13  receiver, but what I'm saying is that I don't

14  recall everything that was provided, but I did try

15  very hard to make sure that everything that was

16  requested was provided.

17      Q.  Okay.  But you would agree with me,

18  Mr. Dowdall, that it's relevant to what your

19  collectible funds would be whether you had a

20  separate property agreement that would cover the

21  pay you got from WAM.  Right?

22          MR. PRONSKE:  Object to --

23      A.  Yeah.  That's legal for me.  I don't know

24  how to answer that.

25      Q.  (BY MR. YARBOROUGH)  Okay.  Let me -- let



**Exhibit 1**

341 Creditors Meeting 04.04.25

```
 1  me -- let me just break it down because it doesn't
 2  have to be a legal question.  It could just be a
 3  factual one.
 4            So the monthly statements of Layla
 5  Dowdall's separate bank accounts under the
 6  separate property agreement would show how much
 7  she received from WAM.  Correct?
 8       A.  I (audio cuts out).
 9       Q.  And --
10            MR. PRONSKE:  I didn't hear the
11  answer.  I just -- it just got blurred out.
12            MR. DOWDALL:  I'm sorry.  The answer
13  was I don't know.
14            MR. PRONSKE:  Okay.  Sorry.
15       Q.  (BY MR. YARBOROUGH)  Okay.  So as you sit
16  here today, can you tell the trustee and the
17  creditors present here today whether the separate
18  property agreement addresses the transfer of your
19  income from WAM?
20       A.  I don't know.
21       Q.  Okay.  And can you confirm here on the
22  record that you still have a copy of the separate
23  property agreement?
24       A.  Yeah.  I can't confirm because I'm not
25  exactly sure if I do or don't.
```



Exhibit 1

1     Q.  Okay.  But if you don't, Mrs. Dowdall

2  would.  Right?

3     A.  I can't speak on behalf of what

4  Mrs. Dowdall has.  I don't know.

5           MR. YARBOROUGH:  I'll pass the

6  witness.

7           TRUSTEE WEISBART:  Ms. Lipp?

8           MR. DOWDALL:  You're muted.

9           MS. LIPP:  Sorry about that.  I

10  apologize.  Sorry.  Thank you.

11               EXAMINATION

12  BY MS. LIPP:

13     Q.  Good afternoon, Mr. Dowdall.  I just have

14  a couple of questions for you.  Your schedule

15  lists Dowdall Financial, LLC.  I also notice that

16  there was another entity, LJ Dowdall Financial, on

17  your 2022 and 2023 tax returns.

18          What does that business -- what is

19  that LLC and what business does it conduct?

20     A.  You've referenced two LLC's.  Can you

21  specify which one you're talking about?

22     Q.  Yes.  There's an entity called LJ Dowdall

23  Financial, LLC.  It is -- it receives -- your 2022

24  and 2023 tax returns reflect it receiving income.

25  What does LJ Dowdall Financial do?  What business

LEXITAS

1   does it conduct?

2        A.  Yeah.  I'd have to go back.  I believe

3   Layla Dowdall is the owner of that so I'm not sure

4   if I have the documentation, but I'd have to go

5   back and look at the documentation for -- to see

6   exactly what its purpose was or is.

7        Q.  And where would the income have come

8   from?

9        A.  Again, I'd have to go back and take a

10  look or ask Mrs. Dowdall.  I'm not -- you know,

11  that's -- I believe she's the owner of that LLC.

12       Q.  It reports business income of over -- of

13  113,000 after expenses on the Schedule C.  So it

14  is a significant amount of money that is reported.

15            MR. PRONSKE:  Your question?

16            MS. LIPP:  Yes.

17       Q.  (BY MS. LIPP)  Does that company have any

18  employees?

19       A.  Again, I would have to do some -- I mean,

20  I don't know how you -- I don't know if I can

21  answer that question.

22       Q.  Have you ever provided any income or sent

23  any checks or provided any financial -- any wages,

24  any income to that entity?

25       A.  I don't remember.



Exhibit 1

1        Q.   Okay.   Where does Ms. Dowdall deposit any

2   pay she receives from her substitute teacher work?

3   Where does she deposit that money?

4        A.   I don't know.

5        Q.   What is the purpose of Dowdall Financial,

6   LLC?

7        A.   That's no longer in existence.   I don't

8   recall the initial purpose.   I think -- yeah.   I

9   apologize.   I don't -- I'm pretty sure that's no

10  longer in existence, but I don't recall the

11  initial purpose of what it -- what it was created

12  for.

13       Q.   Has WAM ever made payments to LJ Dowdall

14  Financial or Dowdall Financial, LLC?

15       A.   I don't know if I can recall.

16            MS. LIPP:   Thank you.

17                    EXAMINATION

18  BY TRUSTEE WEISBART:

19       Q.   I'm looking at the 2023 return that you

20  filed.   I guess it's a joint return.   And there is

21  an LJ Dowdall Financial, LLC.   Who owns that

22  entity, Mr. Dowdall?

23       A.   Layla Dowdall, my wife.

24       Q.   And you're saying you don't know what it

25  does or what it did?

1      A.   Yeah.   I don't recall.   I mean, it was

2   something that was created some time ago, but I

3   don't know what it does now.

4      Q.   Okay.   Then it -- I guess it received K-1

5   income of 113,000 in 2023.   Is that right?   It's a

6   joint return.   You've --

7      A.   Yeah, I mean, if the tax return says

8   that, then I guess, but I'm not -- I don't

9   remember the detail.

10      Q.   Do you -- do you know where that income

11   came from?

12      A.   My first impulse would be to say from,

13   you know, my employ, but I can't say definitively.

14      Q.   You've testified that your wife is a

15   substitute teacher and has no other employment.

16   Is that correct?

17      A.   Yeah.   Well, currently she's a substitute

18   teacher.   She did work as an organizer for -- you

19   know, here and there over the last couple of

20   years.   She no longer does that.

21      Q.   Okay.   What do you mean by organizer?

22   Just a --

23      A.   Like, you know, she would -- she was -- I

24   don't think she was an employee.   She was maybe a

25   1099 or whatnot, but she would go into people's



Case 24-42950    Doc 42-1    Filed 05/20/25    Entered 05/20/25 08:28:27    Desc Exhibit
Transcript of April 4    2025 Meeting of Creditors (redacted)    Page 58 of 77

Exhibit 1

1  houses with a company and, you know, spend a

2  couple of days reorganizing, unpacking, you know,

3  things like that.

4      Q.  Well, I could certainly use that.

5      A.  Hey, it's a great company.  And she's

6  really, really good at it.

7      Q.  So -- but that's -- she got paid for

8  that?

9      A.  She did, but she doesn't do -- like I

10  said earlier, she doesn't do that any longer.

11      Q.  Right, I understand.  But I'm asking

12  about within the year prior to the bankruptcy.

13      A.  She was doing that within a year prior.

14  Forgive me.  I don't remember the exact dates.

15      Q.  Okay.

16      A.  My first impulse would be, yeah, she was

17  doing that during that time.

18      Q.  Did she do that through LJ Dowdall

19  Financial, LLC?

20      A.  I'd have to double-check with her, but I

21  don't believe so.

22      Q.  Okay.  And did she do it -- I guess

23  there's another entity, Dowdall Financial, LLC?

24      A.  Well, that's no longer -- that's been

25  dissolved.



Exhibit 1

1      Q.   So the only entity between you and her is

2  LJ Dowdall.  Right?

3      A.   Well, she's the owner so -- but yes.  I'm

4  sorry.  Between the two of us, yeah, that's the

5  only one that I'm aware of.

6      Q.   Okay.  So her income as an organizer

7  would appear somewhere else on the tax return if

8  she -- if she did work in 2023.  Correct?  It

9  wouldn't --

10     A.   Yes.

11     Q.   It wouldn't appear in -- under the --

12 LJ Dowdall's I guess it's the Schedule C or

13 whatever?

14     A.   I don't believe so.

15     Q.   Okay.  I'm just trying -- I'm just trying

16 to make sure I understand everything.  All right.

17          TRUSTEE WEISBART:  I will need the '24

18 return, Gerrit, if you can provide that to me at

19 your convenience.

20          MR. PRONSKE:  Right.

21          TRUSTEE WEISBART:  And then for the

22 record, Mr. Yarborough, Mr. Dowdall has provided

23 me copies of the tax returns I've requested or

24 just -- not tax returns.  Bank statements, various

25 payroll production of bank statements for the two

LEXITAS

Exhibit 1
341 Creditors Meeting 04.25

1  years prior to the filing of the bankruptcy cases,

2  what I've requested.  And --

3              MR. DOWDALL:  And if I could just --

4              TRUSTEE WEISBART:  Yeah.

5              MR. DOWDALL:  And I'm sorry to

6  interrupt.  It seems like an opportunity for me

7  just to thank you for your time, Mr. Weisbart.  I

8  know this is -- you know, you're very busy, but

9  I'm hoping that we can get this resolved.

10             The emotional toll that this has had

11 on my family and myself has been really

12 challenging.  So anything I can do to move this

13 along I'm happy to do so.

14             TRUSTEE WEISBART:  Oh, I appreciate

15 that.  And, you know, we want to -- I want to move

16 it along, too.

17             MS. LIPP:  Mr. Weisbart, I just have

18 one more question about that LJ Dow --

19 LJ financial before we move on.

20             TRUSTEE WEISBART:  Go ahead.

21                   EXAMINATION

22 BY MS. LIPP:

23     Q.  I noticed also that although there's the

24 113 for the K-1, it reports income of 393,000.  So

25 I would be -- I don't think that's -- I would be

LEXITAS

Exhibit 1

1 curious where that amount came from.

2          TRUSTEE WEISBART:  Do you know the

3 answer to that question?

4     A.  What's the date you're referencing?

5     Q.  (BY MS. LIPP)  It's from your 2023 tax

6 return.

7     A.  Well, prior to -- I don't know the exact

8 answer, but prior to becoming an employee, you

9 know, there were changes in my pay structure or

10 there was a different pay structure so it may be a

11 result of something like that.

12          TRUSTEE WEISBART:  So it's possible

13 that your income went through LJ Dowdall, LL --

14 Financial, LLC?  Is that -- is that possible?

15          MR. DOWDALL:  I don't -- I don't

16 recall.

17     Q.  (BY MS. LIPP)  And in 2022, on the tax

18 return, there are legal and professional fees for

19 LJ Dowdall Financial, LLC, for $273,000.  Do you

20 know what that relates to?

21     A.  I don't.

22     Q.  And income of $393,982 in that year.

23          TRUSTEE WEISBART:  All right.

24          MR. YARBOROUGH:  I have one more

25 question --



1           TRUSTEE WEISBART:  Okay.

2              MR. YARBOROUGH:  -- Mr. Trustee.

3           TRUSTEE WEISBART:  Go ahead.

4                    EXAMINATION

5  BY MR. YARBOROUGH:

6      Q.  So, Mr. Dowdall, just to confirm, your

7  wages do not contain deductions for Worth Asset

8  Management's legal fees, do they?

9      A.  I'm not sure.  I guess I'd have to look

10  into that.  I don't know why -- I don't know.

11      Q.  Okay.  But before -- before you were

12  earning a salary, they were deducting legal fees

13  as they had to respond to subpoenas and other

14  matters relating to your employment.  Is that

15  right?

16      A.  I don't know.

17              MR. YARBOROUGH:  All right.  I'll pass

18  the witness.

19                    EXAMINATION

20  BY TRUSTEE WEISBART:

21      Q.  So the separate property that you

22  mentioned earlier, does that include the vehicle

23  that was purchased for the -- for your daughter,

24  the separate -- this is your wife's separate

25  property.  Is that included in that?

1        A.   On the schedules that I provided?

2        Q.   No.   Just -- do you know if the vehicle

3   that was purchased for your daughter, is that

4   considered community property or your wife's

5   separate property?   Is it subject to the separate

6   property agreement, I guess, is what I'm asking?

7        A.   I'm not entirely sure.   Based on the

8   timing I would -- because the separate property

9   agreement was -- yeah.   I don't know.   I'm sorry.

10        Q.   Okay.   And then does she have any

11   valuable personal property, jewelry, heirlooms,

12   antiques, collectibles that would be considered

13   subject to the separate property agreement?

14        A.   Not that I'm aware of.

15        Q.   Okay.

16             TRUSTEE WEISBART:   All right.   Any

17   other questions?

18             What I'd like to do is go ahead and

19   conclude the meeting.   There are documents that I

20   have not yet seen, some credit card statements and

21   the '24 tax return and the separate property

22   agreement.

23             Yeah.   Just to confirm that you

24   have -- you'll provide me a copy of the separate

25   property agreement.



Exhibit 1

341 Creditors Meeting 04:28

```
 1                    MR. PRONSKE:  Yes.

 2                    TRUSTEE WEISBART:  Okay.  And then --

 3    so I'm going to conclude the meeting, but I'm

 4    going to reserve the right to recall the meeting

 5    if that's the right word or reset the meeting if

 6    there are questions that I have that I can't get

 7    answers to, and I don't anticipate that -- don't

 8    get me wrong -- related to these documents that we

 9    have not seen.  Fair enough?

10                    MR. PRONSKE:  Yes.

11                    MR. DOWDALL:  Thank you.

12                    TRUSTEE WEISBART:  Anything else from

13    anybody?

14                    All right.  Good.  Meeting is

15    concluded then.  Thank you.

16                    MS. LIPP:  Thank you.

17                    (End of digital recording)

18

19

20

21

22

23

24

25
```



Exhibit 1

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF HARRIS    )

 3

 4            I, Diana Ramos, Certified Shorthand

 5  Reporter in and for the State of Texas, do hereby

 6  certify that the above and foregoing is a correct

 7  transcription from the audio recording provided to

 8  me in the above-entitled matter, taken down by me

 9  in machine shorthand and later reduced to

10  typewritten form to the best of my ability.

11            Certified to by me this 30th day of

12  April, 2025.

13              Diana Ramos

14
                Diana Ramos, CSR
15              CSR No. 3133, Expires 1-31-2027
                LEXITAS
16              Firm Registration No. 95
                13101 Northwest Freeway, Suite 210
17              Houston, Texas  77040
                (281) 469-5580
18

19

20

21

22

23

24

25
```



Exhibit 1

Case 24-42950    Doc 42-1    Filed 05/20/25    Entered 05/20/25 08:28:27    Desc Exhibit
Transcript of April 4    2025 Meeting of Creditors (redacted)    Page 67 of 77

Exhibit 1
341 Creditors Meeting 04.04.25

Exhibit 1

341 Creditors Meeting 04.04.25

Exhibit 1

341 Creditors Meeting 04 04 25

LEXITAS

Exhibit 1
341 Creditors Meeting 04.04.25

Exhibit 1

341 Creditors Meeting 04.04.25

LEXITAS

Exhibit 1

341 Creditors Meeting 04.04.25

Exhibit 1

341 Creditors Meeting 04.04.25

888-893-3767
www.lexitaslegal.com

LEXITAS

Exhibit 1

341 Creditors Meeting 04.04.25

LEXITAS

Exhibit 1

341 Creditors Meeting 04.04.25

LEXITAS

Exhibit 1

341 Creditors Meeting 04-04-25

Exhibit 1

341 Creditors Meeting 04.04.25